**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALAN GIANA, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SHEIN DISTRIBUTION CORP.; <br><br> ROADGET BUSINESS PTE., LTD. d/b/a SHEIN; <br><br> SHEIN TECHNOLOGY LLC; and <br><br> SHEIN US SERVICES, LLC, <br><br> Defendants. | No. 24 CV 2599 |

## CLASS ACTION COMPLAINT
## FOR SYSTEMATIC DIGITAL COPYRIGHT INFRINGEMENT

Plaintiff Alan Giana brings this complaint, on behalf of himself and all others similarly situated, against Defendants Shein Distribution Corporation; Roadget Business Pte., Ltd. d/b/a Shein; Shein Technology LLC; and Shein US Services, LLC (collectively, "Defendants" or "Shein"). Plaintiff alleges as follows based on personal knowledge, investigation, and information and belief:

### SUMMARY OF THE CASE

1.      This action seeks damages and injunctive relief due to Shein's industrial-scale scheme of systematic, digital copyright infringement of the work of small designers and artists.

2.      Plaintiff Alan Giana is an artist and designer who, for more than 30 years, has earned a living by creating and licensing artwork.

3.    Defendants are Shein, an e-commerce colossus with annual revenue of over $30 billion. Shein touts itself as a "global fashion and lifestyle e-retailer" that uses "on-demand manufacturing technology" to offer thousands of purportedly new products every day.

4.    But Shein does not create many of its products; it certainly does not design thousands daily. Instead, it uses sophisticated electronic systems that algorithmically scour the internet for popular works created by artists like Mr. Giana. It then misappropriates those works to manufacture and sell as Shein's own products, without notice or attribution to the artists and creators.

5.    Shein uses algorithms, artificial intelligence, and related computerized monitoring systems to identify trending and "viral" images and designs on social media, apps, and websites. It steals those images and designs from their owners, many of whom — like Mr. Giana — are innocent creators who support themselves through creative work.

6.    Shein's very business model relies upon rapid mass production, generating thousands of new products per day.[1] To churn out new items at such a fever pitch, the outputs of Shein's algorithm-based design system — in many instances identical copies of copyrighted works — are transmitted directly to Shein's factories for production, with no human intermediary or compliance function taking care that the algorithm's designs are not the property of others.[2] Shein supplements its electronic data-mining system with online research

---

[1] Rachel Lawler, *Shein IPO 'major event' as 'extensive' range bags $2bn profit in 2023*, Just Style, April 2, 2024, *available at* link. All internet materials cited in this Complaint were last visited on April 5, 2024.

[2] *See, e.g.*, John Foley, *Shein's fast fashion comes with fast-finance risks*, Reuters, March 28, 2024, *available at* link ("At first glance, Shein looks just like an online retailer. But that's deceptive because the company really trades data. It gathers information on how consumers browse and what flicks their switches, in a feat of behavioral analysis analogous to the algorithm that powers short-video app TikTok. It then serves up that information to around 5,000 manufacturers … ."); EcommOps, *How Shein Became a $100B Brand By Leveraging Direct from China Fulfillment*, May 16, 2023, *available at* link; KrASIA Connection, *Unveiling Shein's 'secret' artificial intelligence and the complexities behind its USD 66 billion valuation*, November 8, 2023, *available at* link.

and industrial surveillance of its retail competitors.[3] Widespread copyright infringement is baked into the business.

7.      In recent years, as Defendants expanded their product offerings beyond fashion into electronics, home goods, and other areas, Shein's industrial copying methods invaded those product categories as well. In some cases, Shein unlawfully infringes by copying an entire item, such as a piece of jewelry or a painting, and sells the forgery for a fraction of the price of the authentic product. In other cases, Shein steals a design and slaps it on a different product, as when Shein puts screen prints of an artist's work on inexpensive clothing.[4]

8.      Through Defendants' pervasive infringement, surveillance, and misappropriation scheme, including (without limitation) the reproduction, distribution, display, and sale of products using the infringed or misappropriated images and designs, Defendants have systematically infringed and continue to infringe copyrights owned by Plaintiff and likely thousands or tens of thousands of other persons similarly situated across the United States.

9.      Because neither Plaintiff nor the Class members have authorized, licensed, transferred, or in any way permitted Defendants to use or exploit their copyrighted works, this action seeks to hold Defendants accountable for the widespread financial harm that their unlawful infringement has caused, and seeks to enjoin Defendants from continuing to infringe copyrighted works that belong to Plaintiff and the Class members.

---

[3] LatePost, *Decoding Shein: The rise of China's newest retail decacorn (Part 1 of 3)*, January 25, 2021, *available at* link.

[4] Shanti Das, *'They took my world': fashion giant Shein accused of art theft*, The Guardian, March 6, 2022, *available at* link ("Guardian Art Theft Article").

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the action arises under the Copyright Act. 17 U.S.C. § 501.

11.    Jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b)(2), 1391(b)(3), and 1391(c)(2). Defendants have infringed Plaintiff's rights in this District and the Class members' rights across the United States, causing economic and reputational harm to Class members in this District and across the country. Defendant Shein Distribution Corporation is the seller and payment collection entity for products and services sold by the global Shein group to customers throughout the United States, including customers in this District, and has thereby profited from its infringing activity in this District. The products sold by Defendant Shein Distribution Corporation, through websites and apps owned by Defendant Roadget Business Pte., Ltd. d/b/a Shein, and with the assistance of Defendant Shein Technology LLC and Shein US Services, LLC, as well as their agents, are directed at and intended for commercial use by persons in this District and throughout the United States. In fact, over the past several years, Shein has operated "pop-up" stores in this District, and Shein has indicated that it will continue to do so in the future through a collaboration that it recently entered with the fashion company Forever 21, otherwise known as F21 OpCo LLC.[5]

12.    Unless enjoined, the acts complained of herein will continue to have substantial harmful effects on Plaintiff and the Class members in this District.

---

[5] Melissa Repko, *Shein strikes deal with fast-fashion retailer Forever 21 that will expand reach of both brands*, CNBC, August 24, 2023, *available at* link.

**PARTIES**

13.     Plaintiff Alan Giana is a renowned digital artist and painter who earns a living by creating, licensing, and selling artistic works, including in this District.

14.     Defendant Shein Distribution Corporation ("Shein Distribution") is a Delaware corporation with a principal address located at 757 South Alameda Street, Suite 340, Los Angeles, California 90021. Defendant Shein Distribution is a United States operating company of a China-based global conglomerate that conducts substantial e-commerce business in New York state, within this District, and throughout the United States. Among other things, Defendant Shein Distribution sells products in the United States through the Shein mobile apps and websites.

15.     Defendant Roadget Business Pte., Ltd. ("Roadget") is a business entity organized under the laws of Singapore. It owns the Shein trademarks in the United States, as well as the Shein websites and mobile apps. Among other things, Defendant Roadget has responsibility for developing new products for sale in the United States, including by identifying supposed consumer trends and designing products sold in the United States.

16.     Defendant Shein Technology LLC ("Shein Technology") is a Delaware corporation with a principal address located at 777 South Alameda Street, Los Angeles, California 90021. Among other things, Defendant Shein Technology identifies itself as a U.S. technology company that supports Defendant Shein Distribution's sale of Shein products in the United States.

17.     Defendant Shein US Services, LLC is a Delaware corporation with a principal address located at 777 South Alameda Street, 2nd Floor Los Angeles, California 90021-1672.

Defendant Shein US Services, LLC identifies itself as a services provider that supports Defendant Shein Distribution's sale of Shein products in the United States.

## DEFENDANTS' PERVASIVE, UNAUTHORIZED
## USE OF COPYRIGHTED WORKS

18.    A substantial component of Defendants' success can be attributed to Shein's use of a proprietary electronic monitoring system that uses algorithms and machine learning — also known as artificial intelligence — to track consumer trends and to identify works, designs, and products that Shein's system predicts will be commercially successful.

19.    Shein's use of an electronic monitoring system began in approximately 2017, around the time when the brand broke into the American fashion industry by offering an assortment of trendy, low-priced clothing and accessories of dubious quality.

20.    Shein has used its monitoring system, and variations and improvements upon it, to produce its thousands of "new" products each day, resulting in a pattern of copyright infringement over a substantial period.

21.    Shein's target demographic includes young users of social media platforms such as TikTok and Instagram. With the constant flow of user-generated content on these sites, new fashion trends emerge daily, driven by the popularity of fashion items and creative works created by small businesses and independent designers.

22.    Creators, individuals, and businesses use social media to promote items that consist of their own designs or that incorporate their own patterns, drawings, paintings, photographs, and other creative works. As more and more user-generated content emerges, so follows demand from social media users to purchase the latest fashions.

23.     In turn, Shein's business model relies on consumer demand for large quantities of fashionable products that are constantly refreshed and that sell for lower prices than those that creators, small businesses, and independent designers typically charge for their works.

24.     This very business model helped Shein capitalize on restrictions imposed during the COVID-19 pandemic. While traditional brick-and-mortar retail stores were shuttered in many areas in the United States, Shein took advantage of its e-commerce model to expand. Shein also capitalized on its target demographic's price sensitivity by selling what are commonly referred to as "fast-fashion" or "ultra-fast-fashion" products at rock bottom prices — in many instances well below prices typically charged by fast-fashion brick-and-mortar retailers, such as Forever 21 and H&M Group, which specialize in developing and selling products within the latest fashion trends on a faster timetable than traditional fashion retailers.

25.     Accordingly, Shein has experienced massive growth in annual revenue, from about $3 billion in 2019, to nearly $10 billion in 2020 (as the global pandemic set in), to more than $30 billion in 2023.

26.     Shein's public statements and press and analyst coverage make clear that Shein uses its proprietary technology to ingest and process huge amounts of data regarding the trends on social media sites and other online platforms. After scraping data from non-Shein sources to identify relevant trends, Shein purportedly uses its algorithms to identify products for Shein's suppliers to manufacture. Shein then automatically sends orders for the requested

products to one or more of Shein's legions of suppliers, adjusting production demands depending on the traction that the products get with Shein's customer base.[6]

27.    Shein's sophisticated, for-profit surveillance and copying system results — by design — in product listings on Shein's site that copy and infringe the designs of others, many times even after the actual designers have notified Shein that it is selling infringing works. Discovery regarding Shein's algorithm, machine-learning programs, and related electronic monitoring systems will confirm that this repeated copying of the works of others is not a design flaw or an unanticipated output, but it is an expected and desired feature of Shein's system. Indeed, as discussed below, Shein has already faced multiple lawsuits for infringement of copyrights and trademarks. Moreover, Shein has faced so many informal complaints on social media about its widespread infringement that users have created hashtags that include #sheinstolemyartwork, #sheinarttheft, #sheintheft, #sheinstolemydesign, and #sheinripoff.

28.    Though Shein's electronic monitoring system originally focused on tracking the most current and up-and-coming fashion trends, so that Shein's manufacturers could produce designs based on those trends, in recent years the system has also been monitoring non-fashion products, like paintings and other fine art, such as that created by Plaintiff.

29.    Public reporting confirms that Shein's design and supply-chain systems are fed by data collected from Shein's surveillance and tracking of user behavior on its apps, social media pages, and websites. This data is supplemented with information that Shein's electronic

---

[6] Economic Times, *Clothing giant Shein in focus as France targets fast* fashion, March 22, 2024, *available at* link ("[I]t tracks users' search data and social media trends to generate designs that are almost guaranteed to sell — often appearing to simply copy from other brands."); Isabella Fish, *Inside Shein: Exclusive Interview with Chinese Fast Fashion Giant*, DRAPERS, November 2, 2022, *available at* link; Kenneth P. Pucker*, The Lingering Cost of Instant Fashion*, Harvard Business Review, February 27, 2024, *available at* link.

monitoring system and Shein's research teams pull from non-Shein social media pages, competitors' websites and apps, and the internet more broadly.

30.    For example, Shein's own privacy policy admits that Shein tracks: how customers arrive at its website; what search terms brought them to the page; what customers click on; which pages customers view and in what order; and how much time customers spend on each page. Shein's app requests that users give Shein access to "data and activity from other apps, including social media, in exchange for discounts and special deals on Shein products."[7] In other words, Shein can identify the specific products that its customers view on non-Shein websites and apps in real time, order its suppliers to manufacture identical products, and then offer counterfeit and infringing products on the Shein websites and apps to the same Shein customers that were viewing the original versions on non-Shein websites and apps.

31.    Shein has a history of generating exact copies of other designers' art and works, including copyrighted works owned by Plaintiff and other creators who comprise the Class. For instance, as The Wall Street Journal reported that Shein has faced lawsuits for copyright or trademark infringement brought by plaintiffs across the retail spectrum, including giants like Ralph Lauren and Uniqlo, as well as independent fashion and jewelry designers.[8]

32.    Other apparel companies and brands spend millions on trend-forecasting firms, consultants, and other services to track up-and-coming fashion trends. While they do so,

---

[7] Daxue Consulting, *Shein's Market Strategy: How the Chinese Fashion Brand Is Conquering the West*, February 5, 2024, *available at* link. *See also* Amy Oliver, *China's fast-fashion spy machine: How shadowy teen brand Shein uses algorithms to harvest data on its users and find out what they want to buy – before its mega-factory spits the clothes out at rock-bottom prices*, Daily Mail, August 28, 2021, *available at* link.

[8] Dan Strumpf, *China's Fast Fashion Giant Shein Faces Dozens of Lawsuits Alleging Design Theft*, THE WALL STREET JOURNAL, July 3, 2022, *available at* link ("WSJ Article").

reputable companies take steps to comply with intellectual property laws, using the trends identified by these services as inspiration for their own designs, rather than copying them.

33.     Shein behaves differently. Shein eschews third-party forecasting firms and consultants and instead relies on its in-house machine-learning algorithms and related tools to track fashion trends. And unlike apparel companies and brands that let fashion trends *inspire* their own designs, Shein's algorithm *duplicates* the work of other designers, stealing those designs for Shein's use and benefit.

34.     Rather than respect designers' intellectual property rights, Shein treats the costs of litigating and settling copyright infringement claims as a necessary business expense, which it builds into its financial models.[9] Defendants inevitably settle infringement claims without a trial.

35.     But when Shein copies the work of smaller, independent designers and artists, it is highly likely that the infringement will either go unnoticed — because designers and artists may not have the resources to comb the web for infringement — or will not lead to litigation, due to the prohibitive costs of individual action. Many designers and artists only become aware of Shein's infringement because they are fortunate (or unfortunate) enough that friends, fans, or customers spot a knockoff on Shein's website or app.[10]

36.     Moreover, because of the Shein algorithm's preference for cutting-edge, fashionable trends, the independent designers who are most often the source of viral hits are most likely to have their works stolen by Shein for repackaging as Shein products.

---

[9] *See, e.g.*, Wang IP Law Group P.C., *Shein Faces $100 Million Lawsuit For Copyright Infringement*, July 20, 2022, *available at* link.

[10] *See, e.g.*, Guardian Art Theft Article; WSJ Article.

37.     For example, one independent artist complained to Shein on multiple occasions after discovering that Shein was selling products bearing her artwork without permission. As the designer continued discussions with Shein about compensating her for the infringing products, Shein began selling different products that also bore the designer's artwork, yet again without permission. The artist identified at least nine Shein products that used her designs without permission or compensation, yet she could not hire a lawyer to pursue claims against Shein because of the likely cost to litigate her rights.[11]

38.     When Shein copies works by designers or artists and then sells them at a low price, Shein significantly harms the victims of its theft. Oftentimes, the works that Shein steals from designers and artists are highly successful. This outcome is not surprising, given that Shein targets designs that are in demand and valuable enough to copy. Shein's misappropriation and sale of designers and artists' works at low prices harms the victim by stealing sales directly from that designer or artist, and also by stealing downstream sales of licensed products. Shein's scheme not only diminishes the value of the original works and licensed products but also diminishes fashion retailers' and outlet buyers' appetite to license or resell the designers and artists' works.

39.     Shein's pervasive and systematic intellectual property theft therefore exploits the hard work and talent of designers and artists, allowing Shein to reap the financial benefits of a pattern, design, drawing, painting, photograph, image, or other artwork that its algorithm-based monitoring system has identified as having a high potential of commercial

---

[11] WSJ Article. While some artists have sued Shein for its blatant infringement — as this litigation and the dozens of other recent suits against Shein demonstrate — many others are like the artist discussed in the WSJ article and forgo suing Shein for its misconduct because of the time and cost it would take to litigate. *See, e.g.*, Guardian Art Theft Article; Ellie Violet Bramley, *'Details I made, they made' – designers hit back at Shein's imitation game*, The Guardian, September 2, 2023, *available at* link.

success, leaving the original designer or artist of such a valuable work empty handed. And Shein has largely been able to get away with its scheme because these designers and artists have fewer resources to pursue legal action to vindicate their rights — if they are even aware of Shein's unlawful infringement in the first place.

40.     Defendants' years-long use of a sophisticated system of algorithms, artificial intelligence, and other electronic surveillance to copy and appropriate copyrighted works designed and owned by others confirm that Shein's serial copyright infringement is willful — and not merely a result of ignorance that Defendants' conduct constitutes copyright infringement. Defendants are and have been aware that deliberately taking the works of others and passing them off as the works of Defendants or Defendants' suppliers results in pervasive infringement of the copyrights of others, including the Class members.

41.     Indeed, what little Shein has said publicly about these lawsuits confirms that Shein's widespread infringement of copyrights owned by Plaintiff and Class members is intentional. For instance, Shein has attempted to pin the blame for its pervasive copyright infringement on suppliers by insisting that Shein's suppliers must "certify their products do not infringe third-party IP."[12] Yet the suppliers generally do not create new products for Shein to sell; rather, Shein uses its surveillance systems to identify products that it then directs the suppliers to manufacture.[13]

42.     Furthermore, unless Shein has purged data in a gambit to avoid liability, Shein must be in possession of electronically-stored information showing: (1) the source from which

---

[12] WSJ Article.

[13] *See, e.g.*, Benelux Chamber Shanghai, *The Enigma of SHEIN: Unraveling the Success of the Mysterious Online Retailer*, July 17, 2023, *available at* link.

Shein's algorithm extracted each particular work at issue; (2) the time at which Shein transmitted the design for an infringing work to its suppliers for manufacture; (3) each instance when Shein sold an infringing work to a customer; (4) the customer name, order and shipping date, order and shipping location; (5) the price at which the product was sold; and (6) the net cost paid to the supplier to manufacture the infringing work.

43.     As a result, Shein, and not the suppliers, is in the best position to know — and, in fact, does know — whether a particular product that it instructed its suppliers to manufacture was created by a Shein employee or one of Shein's suppliers, or instead was copied from a non-Shein website or app.

### DEFENDANTS' INFRINGEMENT OF PLAINTIFF'S WORK

44.     Plaintiff Alan Giana is a renowned artist.

45.     Mr. Giana creates colorful works in a style inspired by nature and the sea.

46.     Mr. Giana has earned a living for more than 30 years by creating art and by selling and licensing it to collectors and commercial distributors.

47.     Mr. Giana's father was a ceramic artist. In school, Mr. Giana studied design and business management.

48.     During his long career, Mr. Giana has combined his artistic and business talents to build a reputation and commercial enterprise centered on his artwork.

49.     Mr. Giana has licensed his popular works to more than fifty companies in the United States and around the world for use in (among other products) puzzles, address labels, calendars, checks, cards, gift bags, gift boxes, tins, mugs, canvas prints, placemats, note cards, coasters, magnets, clocks, thermometers, music boxes, cross-stitch kits, cellular phone cases, and diamond painting kits.

50.    Mr. Giana's original works have also been displayed in galleries and art shows throughout the United States.

51.    In addition, and in recognition of the broad appeal and commercial value of his works, Mr. Giana has won awards, including the Premier Print Award from the Printing Industry of America and the Oppenheim Toy Portfolio Best Toy Award.

52.    Mr. Giana has never licensed any of his works to Defendants.

53.    Like other independent artists similarly situated, Mr. Giana's artworks were not spared from the Defendants' modus operandi of infringement.

54.    Defendants, through their algorithmic technology, copied and displayed Mr. Giana's artwork on Defendants' website without any authorization or permission, manufactured products bearing Mr. Giana's artwork, and earned profits from the sale of such infringing products.

[*Continued on following page*]

55.     For example, in or about 2012, Mr. Giana created the original work "Coastal Escape," which is registered with the United States Copyright Office under Reg. No. VAu 1-110-099:



56.     Defendants' algorithmic technology identified Coastal Escape on the web and copied it without authorization for display and sale as Shein products, including "Beach Print DIY Diamond Painting Without Frame":



*Giana v. Shein Distrib. Corp. et al.*, No. 24 CV 2599

CLASS ACTION COMPLAINT | 15

57.    Mr. Giana invested time, money and effort in creating his artistic work.

58.    Defendants used the commercial success and reputation of Mr. Giana in the art industry for their own profitable gain.

59.    Mr. Giana and all other artists similarly situated are victims of Defendants' unlawful scheme of mass-producing copyrighted works using its algorithmic technology and then selling it at a low price in the market.

## CLASS ALLEGATIONS

60.    Plaintiff brings this action for damages and injunctive relief as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and in the alternative, Rule 23(c)(4).

61.    Specifically, Plaintiff brings this action for damages under Rules 23(a) and 23(b)(3), on behalf of the following Damages Class:

> All persons or entities in the United States who, at any time between April 5, 2021, and the date on which there is final judgment of this action, owned a registered United States copyright in a work that Defendants reproduced, distributed, or displayed after the effective date of registration.

62.    The definition of the Damages Class excludes the following:

a.    the Defendants and their parent companies, subsidiaries, affiliates, officers, directors, management, employees, or agents;

b.    all governmental entities; and

c.    the judges in this case and any members of their immediate families.

63.    In addition, Plaintiff brings this action for injunctive relief under Rules 23(a) and 23(b)(2) on behalf of the following Injunctive-Relief Class:

> All persons or entities in the United States who, at any time between April 5, 2021, and the date on which these is final

judgment of this action, owned a United States copyright in a work that Defendants reproduced, distributed, or displayed.

64. The definition of the Injunctive-Relief Class excludes the following:

a. the Defendants and their parent companies, subsidiaries, affiliates, officers, directors, management, employees, or agents;

b. all governmental entities; and

c. the judges in this case and any members of their immediate families.

65. While Plaintiff does not know the exact number of Class members, in part due to Defendants' efforts to conceal their business practice of serial copyright infringement, there are likely thousands of members in each of the proposed Classes throughout the United States. Defendants systematically have been stealing the copyrights of others without authorization for years. Moreover, Defendants make available thousands of articles of clothing, jewelry, and other items each day. With many millions of opportunities to infringe, and the widespread allegations of infringement against Shein, each of the proposed Classes may number in the tens of thousands. The size of the Classes and dispersion of Class members, combined with the fact that potential Class members have already reported not being able to bring their own suits to remedy Defendants' infringement, demonstrate that joinder of all Class members is impracticable.

66. Plaintiff's claims are typical of those of the Class members. Plaintiff and the Class members were all injured by the same unlawful conduct by Defendants — the use of an algorithm and other systematic means to engage in widespread copying and unauthorized reproduction, distribution, or display of copyrighted works.

67. Plaintiff will fairly and adequately protect and represent the interests of the Class members. Plaintiff's interests are not in conflict with the interests of the Class members;

rather, Plaintiff and Class members share the same interest in putting a stop to Defendants' serial, automated copyright infringement and obtaining redress for the harm that Defendants' unlawful conduct has caused.

68.    Plaintiff is represented by counsel with experience in prosecuting class actions and in pursuing and prevailing on claims for infringement of intellectual property rights.

69.    Questions of law and fact common to the Class members predominate over questions that may affect only individual Class members because Defendants infringed the copyrights of all Class members through the use of the same algorithm and systematic copying process, thus causing the same type of harm to each Class member and warranting an award of the statutory damages that Plaintiff seeks on behalf of himself and all Class members.

70.    Questions of law and fact common to the Class include the following, without limitation:

a.    Whether Defendants used algorithms, artificial intelligence, and/or other systematic processes to copy pictures, drawings, paintings, images, patterns, designs, and other works created by Class members;

b.    Whether Defendants' use of algorithms, artificial intelligence, and/or other systematic processes directly led to copying of the pictures, drawings, paintings, images, patterns, designs, and other works created by Class members;

c.    Whether Defendants' reproduction, display, or distribution of pictures, drawings, paintings, images, patterns, designs, and other works created by Class members violated the copyrights of Class members;

     d.    Whether Defendants attempted to use any effective means to prevent copying of works created by Class members and others;

     e.    Whether this Court should enjoin Defendants' conduct because it has caused and will continue to cause harm unless enjoined;

     f.    The scope of any such injunction, including whether further equitable relief is warranted to remedy Defendants' serial infringement;

     g.    Whether Defendants' infringement was committed willfully, such that increased statutory damages per work infringed are appropriate; and

     h.    Whether any affirmative defense excuses Defendants' conduct.

71.    Allowing this suit to proceed as a class action is superior to any other available method for fairly and efficiently adjudicating this controversy. By proceeding as a class action, this action will resolve all similar claims involving Defendants' unlawful use of a common mechanism for infringing the copyrights of all Class members, thus eliminating the possibility of repetitive litigation. In addition, a class action is the only practical means for remedying Defendants' unlawful, serial infringement of Class members' copyrights, as they have neither the time nor resources sufficient to bring their own individual lawsuits against Defendants. Because many of Shein's products sell in relatively small quantities, many Class members are likely unaware of Shein's infringement of copyrights that they own. And even for Class members who are aware of Shein's infringement, Class members are unlikely to have sufficiently large actual or statutory damages claims to warrant paying for an attorney to bring their own claims in an individual suit. Thus, any decision preventing this case from proceeding as a class action would effectively permit Defendants to continue their

widespread, harmful, and illegal infringement, safe in the knowledge that most copyright owners will be unable to seek redress for Defendants' wrongdoing.

72.     Plaintiff is aware of no significant difficulties in managing this action as a class action, rather than a series of individual lawsuits or a single lawsuit involving the joinder of thousands, tens of thousands, or even hundreds of thousands of Class members bringing their own claims.

73.     Because Defendants have engaged in a single course of conduct that has injured the Class as a whole, as well as its members individually, final injunctive relief is warranted against the Defendants with respect to all Class members.

## EFFECTS ON INTERSTATE COMMERCE

74.     During the period applicable to this lawsuit, Defendants manufactured, marketed, promoted, distributed, and sold products in an uninterrupted flow of commerce across state and national lines and throughout the United States, including by marketing products through the unauthorized use of copyrights owned by Plaintiff and Class members, and incorporating into such products copyrights owned by Plaintiff and Class members, without obtaining any licenses, authorizations, or permission to use such copyrights.

75.     To effectuate their copyright infringement scheme, Defendants transmitted funds, contracts, invoices, and other types of business transactions or communications, in a continuous flow of commerce across state and national lines and throughout the United States, including through the use of the United States mails, as well as interstate and international telephone lines, and through interstate and international travel.

76.     Defendants' infringement campaign and related activities were within the flow of and had substantial effects on domestic, import, and interstate commerce.

## FIRST CAUSE OF ACTION

## COPYRIGHT INFRINGEMENT
### UNDER 17 U.S.C. §§ 106, 501

77.     Plaintiff incorporates by reference all preceding allegations in this Complaint.

78.     Because Plaintiff and Class members are the owners of registered copyrights in pictures, drawings, paintings, images, patterns, designs, and other works at issue in this litigation, Plaintiff and Class members hold the exclusive rights to these works under the Copyright Act. *See* 17 U.S.C. § 106.

79.     Plaintiff and the Class members have not assigned or transferred their rights to these works to Defendants, nor have they authorized Defendants to reproduce, distribute, display, or copy these works, or make any derivative works from them.

80.     Defendants used algorithms, artificial intelligence, and other systematic means to find and copy Plaintiff and Class members' copyrighted pictures, drawings, paintings, images, patterns, designs, and other works.

81.     After copying protected works owned by Plaintiff and Class members, Defendants reproduced, distributed, or displayed these works to sell products on Defendants' e-commerce apps and/or websites, thereby earning profits directly by infringing the copyrights of Plaintiff and Class members, in violation of 17 U.S.C. § 501.

82.     Due to the injury caused by Defendants' willful and unlawful campaign of copyright infringement, Plaintiff and Class members are entitled to statutory damages and other remedies set forth below.

**PRAYER FOR RELIEF**

83.     WHEREFORE, Plaintiff respectfully requests that the Court enter judgment on his behalf and on behalf of the Class by:

      a.      Certifying the Class defined herein to pursue damages under Rule 23(b)(3), to pursue injunctive relief under Rule 23(b)(2), and in the alternative, to litigate common issues regarding Defendants' serial copyright infringement under Rule 23(c)(4);

      b.      Directing that reasonable notice of this action be given to the Class under Rule 23(c)(2), and appointing Plaintiff as representative of the Class and Plaintiff's counsel as Class Counsel;

      c.      Declaring that Defendants' conduct as described herein constitutes unlawful copyright infringement under 17 U.S.C. §§ 106 and 501;

      d.      Entering an injunction, as provided for under 17 U.S.C. § 502, enjoining Defendants and any of their parents, subsidiaries, affiliates, employees, or agents, from using an algorithm or any other systematic method for reviewing or copying any pictures, drawings, paintings, images, patterns, designs, and other works, in order to design, market, sell, promote, or otherwise distribute or display any products on any of their sales apps/websites;

      e.      Declaring that Defendants' infringing conduct as described herein constitutes willful copyright infringement under 17 U.S.C. § 504;

      f.      Entering judgment in favor of Plaintiff and the Class against Defendants for statutory damages for each work by Plaintiff and the Class members

that Defendants infringed, including the increased statutory damages award provided for under 17 U.S.C. § 504(c)(2) due to Defendants' willful copyright infringement;

g.    Awarding Plaintiff and the Class their costs of suit, including reasonable attorney's fees, as provided for under 17 U.S.C. § 505; and

h.    Granting such other further damages or relief as is necessary to correct the widespread harm caused by Defendants' unlawful copyright infringement scheme, as this Court deems just.

## DEMAND FOR JURY TRIAL

84.    In accordance with Rule 38, Plaintiff respectfully demands trial by jury on all issues so triable.

Dated:    April 5, 2024
            New York, NY

                           MULLEN P.C.

By:    Wesley M. Mullen
       Vincent R. FitzPatrick III
       745 Fifth Avenue, Suite 500
       New York, NY 10151
       wmullen@mullenpc.com
       vfitzpatrick@mullenpc.com
       (646) 632-3718

       Justin S. Nematzadeh
       NEMATZADEH PLLC
       101 Avenue of the Americas, Suite 909
       New York, NY 10013
       jsn@nematlawyers.com
       (646) 799-6729

       *Attorneys for Plaintiff and the Class*